Saul E. BRAMER, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 73–2709–AAH.

United States District Court,
C. D. California.

April 5, 1976.

Gelfand, Berggreen, Feinberg & Rogers by Leo Gelfand, and William J. Gargaro, Jr., Beverly Hills, Cal., for plaintiff.

William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civ. Div., Donald A. Fareed, Asst. U. S. Atty., Chief Trial Counsel, Los Angeles, Cal., and Jake J. Chavez, Atty., U. S. Energy Research and Development Administration, Albuquerque, N. M., for defendant.

## DECISION FOR DEFENDANT UNITED STATES OF AMERICA

HAUK, District Judge.

This matter came on originally for hearing on Tuesday, March 2, 1976, at 9:30 a. m., before the Honorable A. Andrew Hauk, United States District Judge, on cross-motions for summary judgment offered by both the plaintiff and the defendant upon the issues of tort duties, if any, owed by the Government to the plaintiff and the negligence, if any, of the Government.

Both motions were denied and the matter proceeded, upon stipulation of the parties, to a bifurcated court trial on Monday, March 15, 1976, at 10:00 a. m.—jury being impermissible under the Federal Tort Claim Act, 28 U.S.C. § 2404—upon these issues, which are essentially one issue, namely that of liability.

The further issue of damages was deferred by stipulation until the Court's ruling on liability.

The evidence consists of the admitted facts in the pretrial conference order and the affidavits and exhibits submitted by both sides in support of their respective cross-motions for summary judgment. The parties further agreed that their arguments are fully set forth in their respective memoranda in support of their motions for summary judgment and their respective memoranda of contentions of fact and law filed pretrial.

The Court having carefully considered and analyzed the facts and the law, as well as the arguments and contentions of the parties, now renders its decision and order

for judgment in favor of defendant, United States of America.

## PRELIMINARY

This is an action for damages against the Government under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) et seq. based upon personal injuries suffered by plaintiff, Saul E. Bramer, due to the alleged negligent acts and omissions of employees of the Atomic Energy Commission, "AEC," said injuries having occurred on July 31, 1971, in the premises of Wing 9, C.M.R. Building, Los Alamos Scientific Laboratories in Los Alamos, State of New Mexico.

Federal jurisdiction and venue are properly invoked under the Federal Tort Claims Act upon the ground that the plaintiff, a citizen of the State of California, was a visitor at the Los Alamos Scientific Laboratories premises located in Los Alamos, New Mexico, said installation being run by the University of California under a contract with the United States Atomic Energy Commission, an agency of the Government, which was acting within the scope of its agency. 28 U.S.C. § 1346(b). At the time of the commencement of the action, plaintiff resided in the Central District of California. Therefore we have jurisdiction and proper venue.

## FACTS

1. Plaintiff is a citizen of the United States and is a resident of the State of California, County of Los Angeles.

2. This action is brought under the provisions of the Act, commonly known as the Federal Tort Claims Act, pursuant to the provisions of 28 U.S.C. § 1346(b), and 2671 et seq.

3. Plaintiff is an employee of the Defense and Space Systems Group of TRW, Inc., hereinafter referred to as "TRW Systems," Number 1 Space Park, Redondo Beach, California.

4. The United States Atomic Energy Commission, as of July 31, 1971, was a Federal executive agency created by 42 U.S.C. § 1802(a)(1), although it was abolished and is now known as the Energy Research and Development Administration, "ERDA," which was created by the Energy Reorganization Act of 1974, Public Law 93–438, 88 Stat. 1233, 42 U.S.C. § 5801 et seq. That Act was made effective on January 19, 1975. Pursuant to this Energy Reorganization Act of 1974, all functions of the AEC relevant hereto were assumed by ERDA.

5. On or about July 26, 1971, plaintiff was sent by his employer, TRW Systems, to Los Alamos Scientific Laboratories in Los Alamos, New Mexico, hereinafter referred to as "LASL," to observe the disassembly of a Transit Radioisotope Heat Source, a capsule containing radioactive material.

6. This disassembly took place on July 31, 1971, in the premises of the laboratory located at Wing 9, C.M.R. Building, LASL, which is operated by the Regents of the University of California, hereinafter referred to as "University," under a contract with the United States Government, Contract No. W–7405–ENG–36, Modification No. 114. The building, together with the real property on which it is situated is owned by the United States Government.

7. Under its contract with the University in effect on July 31, 1971, the AEC had a contractual right to inspect the premises of Wing 9, C.M.R. Building, LASL, from the standpoint of health and safety.

8. On Saturday, July 31, 1971, plaintiff was in Wing 9 of the C.M.R. Building at LASL for the purpose of observing this disassembly. This facility contains "hot" cells, specifically built in insulated rooms with select transparent walls or windows through which observers view the examinations and procedures performed upon radioactive materials within. The Transit Radioisotope Heat Source was within a "hot" cell. Plaintiff was in a work area adjacent to the windows of the particular "hot" cell in which the radioactive material under study was being processed.

9. On July 31, 1971, while plaintiff was in the work area, a radiation leak occurred which was the result of equipment failure, and plaintiff was injured. This equipment was owned by the United States Government and was under the ultimate control of

the employees of LASL, but under the immediate and operational control of the independent contractor, the University of California.

10. On or about March 26, 1973, pursuant to 28 U.S.C. § 2675 et seq., a claim was filed by plaintiff with the AEC in Albuquerque, New Mexico, for damages for personal injuries in the amount of $1,000,-000.00. This claim was denied in its entirety by the AEC on July 16, 1973.

## LAW

The first issue that must be resolved is whether assuming *arguendo* that the AEC was somehow negligent, did it owe tort duties to the plaintiff and this, in turn, will depend on the contract it had with the University. In order to resolve this issue, it is necessary to answer a couple of questions at the outset:

First, is working with radioactive materials such an "inherently dangerous" activity that under the "non-delegable duty" doctrine, the AEC had any tort duties to plaintiff which it could not delegate to the University as an independent contractor? If so, then,

Second, is there any overriding reason why the AEC should be relieved from any such "non-delegable" tort duties by reason of its contract with the University, or by reason of statutory or decisional law, or both?

There are two closely-related tort law concepts which could possibly impose upon the AEC tort duties to plaintiff that could not be passed on or delegated to the University by the contract or otherwise. The first of these is the concept that an employer is liable if it is contracting out "inherently dangerous" work or activity. Section 416 of the *Restatement of Torts 2d* retains in the employer a tort duty even though the contract has provisions that place upon the independent contractor the duty of protecting third persons against "inherently dangerous" activities.

The second concept is the theory of "non-delegable duty," wherein an employer, who is under a duty to do certain work carefully, cannot escape responsibility by contracting the work out to an independent contractor. *Restatement of Torts 2d*, § 423 and § 424. Under this "non-delegable duty" theory, the rationale is to place the tort duty and, therefore, the liability for negligence on, the employer, the party who is ultimately responsible for carrying on the activities.

The ultimate result of both of these concepts is that the employer retains the tort duties and the liabilities for negligence even though an independent contractor has been employed by contract to perform the activities.

■ The uncontroverted facts of the instant case demonstrate that the Government cannot avoid consideration of its possible liability under the first of these two theories. There is little question but that work with radioactive materials must be considered "inherently dangerous" when in fact the AEC and the University recognized such "inherent danger" in the contract itself.

The work must be considered "inherently dangerous" when, in fact, the University and the AEC recognized it as "inherently dangerous" as early as April 5, 1948, in their basic agreement (hereinafter "pre-1954 contract") Modification No. 19, page 29 thereof, Article XIV:

"The Commission and the Contractor recognized that, in part this work involves unusual, unpredictable, and abnormal risks."

This is further buttressed by Modification No. 114, the successor contract entered into on April 13, 1967, and in effect at the time of the incident in question on July 31, 1971 (hereinafter "post-1954 contract"), where it is provided in Article XXVIII, paragraph 1, pages 73 and 74 as follows:

"Inasmuch as the performance of the University's operations hereunder may subject employees to serious and unusual hazards with respect to which it is impossible to provide adequate protection, the University shall have the right to make payments, in addition to those provided

for by Workmen's Compensation laws or other statutes or under the terms of University's employee welfare plan and policies, to or on account of employees who become disabled or die as a result of such hazards."

■ The Restatement view, *Restatement of Torts 2d,* § 416, has been adopted in New Mexico, *Pendergrass v. Lovelace,* 57 N.M. 661, 262 P.2d 231 (1953), and *Montanez v. Cass,* 89 N.M. 32, 546 P.2d 1189 (1975), State Bar of New Mexico, Advance Opinions, Volume 14, No. 38 p. 1040 (December 11, 1975), and we must follow it because under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the applicable law is "the law of the place where the act or omission occurred." See, *generally, Hess v. United States,* 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960); *Campbell v. United States,* 493 F.2d 1000 (9th Cir. 1974).

And we must do so, even though there is a provision in the original pre-1954 contract, Modification 19, Article XVIII, p. 36, that the independent contractor:

"shall initiate and take all reasonable steps and precautions to protect health and minimize danger from all hazards to life and property, and shall make all reports and permit all inspections as required by the Commission and shall conform to all minimum health and safety regulations and requirements of the Commission."

Moreover, Article XII, pp. 46–47, in the post-1954 contract in force at the time of the incident, Modification No. 114, contains a similar clause:

"The University shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property, and shall comply with all pertinent health, safety, and fire protection regulations and requirements (including reporting requirements) of the Commission communicated to the University. In the event the University fails to comply with said regulations or requirements of the

Commission, the Contracting Officer may without prejudice to any other legal or contractual rights of the Commission, issue an order stopping all or any part of the work; thereafter a start order for resumption of work may be issued at the discretion of the Contracting Officer."

Despite these clauses, and following New Mexico law in the absence of some supervening Federal law, it would seem that the AEC as the employer would be responsible for injuries caused by negligence of the independent contractor because of the "inherently dangerous" nature of the activities being conducted.

This reasoning seems to fly in the face of the rationale of two Federal cases: *Parsons v. Amerada Hess Corporation,* 422 F.2d 610, 614 (10th Cir. 1970) which specifically held:

"Until, therefore, New Mexico has spoken more explicitly to our subject, we must conclude that an employee of an independent contractor is not within the class of third persons to whom the employer of the independent contractor owes the nondelegable duty of due care while such employee is engaged in the performance of inherently dangerous contracted work."

And this holding was followed in *Madrid v. Mine Safety Appliance Company,* 486 F.2d 856, 861 (10th Cir. 1973) which after quoting the above language from *Parsons,* added:

"The New Mexico Court not having, to date, spoken more explicitly on the subject, our conclusion remains as stated in *Parsons.*"

These holdings distinguish *Pendergrass,* supra, 57 N.M. 661, 262 P.2d 231 (1953), on the grounds that it involved third persons *not* employees of the independent contractor, whereas the two Federal case involved employees of the independent contractor. And the New Mexico Supreme Court has now, five years after the 1970 *Parsons* case and two years after the 1973 *Madrid* case in the 10th Circuit, "spoken more explicitly on the subject" in *Montanez v. Cass,* supra, 89 N.M. 32, 546 P.2d 1189 (1975), by disagreeing with *Parsons* and *Madrid,* and after

citing *Pendergrass* and *De Arman v. Popps,* 75 N.M. 39, 400 P.2d 215 (1965), winds up following the *Restatement of Torts 2d,* § 416 in this excerpt (State Bar of New Mexico, Advance Opinions, Vol. 14, No. 38, p. 1040 at p. 1043):

"We conclude that § 416 explicitly states that the meaning of the words 'to others' includes 'the employee of the independent contractor'. It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."

And we also note that in the situation here before us we have an injured third party who was *not* an employee of the independent contractor doing the work; that is to say, plaintiff was and is an employee of TRW, not of the University.

Query: whether the plaintiff, as an employee of TRW, another AEC independent contractor, is precluded from suing the Government, by reason of *Roelofs v. United States,* 501 F.2d 87 (5th Cir. 1974) and *Olivas v. United States,* 506 F.2d 1158 (9th Cir. 1974)?

Put another way, is the Government immune because in the AEC–TRW December 9, 1968, contract—AT (29–2)–2617, Articles XIII and VII—TRW agreed to maintain Workmen's Compensation Insurance and the Government agreed to pay the costs thereof?

*Roelofs* and *Olivas* would indicate that the Government might have the same immunity as TRW for injuries suffered by TRW employees covered by Workmen's Compensation Insurance, and therefore could not be liable to plaintiff who was employed by TRW, even though he had no employment relationship with the University.

But we do not have to decide this issue, because as we point out later in this decision, the Government by the 1954 AEC Act and the exemption provision of the Federal Tort Claims Act (28 U.S.C. § 2680(a)) is not

bound by either the "non-delegable duty" doctrine or by the "inherently dangerous" duty doctrine which are, in essence, really identical doctrines.

As to the theory of "non-delegable duty," although the land and facilities upon which the accident occurred were owned by the Government, the accident itself was not caused by the physical makeup of the land or structures upon the land.

Rather, it was caused by alleged negligence of the independent contractor engaged in "inherently dangerous" activities in the laboratory. Thus, the line of cases that deals with a *landowner's* "non-delegable" duties is of very limited significance under the facts here.

▄ In any event, it is sufficient to point out that the work contracted out by the Government to the University was "inherently dangerous" and that, therefore, the Government ordinarily would not escape responsibility for negligent acts done by the independent contractor in pursuance of the contractual objectives unless there are special reasons for such escape.

▄ The Government argues that there is Federal legislation which prevents it from being liable for acts contracted out by the AEC and, therefore, it should not be liable for the negligent acts of the University, regardless of New Mexico State law. Assuming that there is such legislation, there is an inescapable clash between the provisions of the Federal legislation and the application of the New Mexico State law.

In this event, the Supremacy Clause of the United States Constitution (Article VI, Clause 2 [1]) would come into effect and the Federal legislation would necessarily supersede the State law.

▄ The Government contends that the United States is not liable for acts of independent contractors where the contract is based on the provisions of the Atomic Ener-

---

1. Clause 2. Supreme Law of Land

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

gy Act of 1954 (42 U.S.C. § 2011 et seq.). Under this 1954 AEC Act, Congress gave to the AEC a great deal of discretion in dealing with all aspects of the advancement of atomic energy, and of course, passed this function on to the ERDA in the 1974 Energy Reorganization Act, 42 U.S.C. § 5801, § 5814. Within this area of discretion lie the AEC's duty and power to deal with matters relating to health and safety at the research laboratories. Congress specifically dealt with the health and safety aspects of AEC contracts in 42 U.S.C. § 2051(a) which states in pertinent part:

"(a) The Commission [AEC] is directed to exercise its powers in such manner as to insure the continued conduct of research and development and training activities in the fields specified below, by private or public institutions or persons, and to assist in the acquisition of an ever-expanding fund of theoretical and practical knowledge in such fields. To this end the Commission is authorized and directed to make arrangements (including contracts, agreements, and loans) for the conduct of research and development activities relating to . . .

\* \* \* \* \* \*

(5) the protection of health and the promotion of safety during research and production activities.

\* \* \* \* \* \*

(d) The arrangements made pursuant to this section shall contain such provisions (1) to protect health, (2) to minimize danger to life or property, and (3) to require the reporting and to permit the inspection of work performed thereunder, as the Commission may determine. No such arrangement shall contain any provisions or conditions which prevent the dissemination of scientific or technical information, except to the extent such dissemination is prohibited by law."

Section 2052 of the same Act reads as follows:

"The Commission is authorized and directed to conduct, through its own facili-

ties, activities and studies of the types specified in section 2051 of this title," including, of course, "the protection of health and the promotion of safety" specified in § 2051(a)(5). These provisions of the 1954 Act were successors to Section 3 of the AEC Act of 1946; see *Atomic Energy Legislation through 93rd Congress*, 1st Session, Joint Committee Print, Joint Committee on Atomic Energy, Appendix B.

Before the promulgation of the 1954 Act, the Joint Committee evaluated and studied the administration and the workings of the AEC under the provisions of the 1946 Act. *Senate Report 1211*, 79th Congress, 2nd Session, pp. 4–7. Congress was aware of the manner in which the AEC delegated powers and duties for the advancement of science and it knew of the leasing of government facilities, including the LASL, to private and public institutions. By passing the 1954 Act, Congress approved the already existing management of the AEC, certainly as it governed the health and safety requirements that had existed since 1946.

Now, as we have seen, both the pre-1954 contract and the post-1954 contract between the AEC and the University, expressly state the concept that the University as the independent contractor was in charge of all supervision and control of its employees, with only a residual right on behalf of the Government to inspect. This perhaps can best be exemplified by Article XVIII of Modification No. 19 of the pre-1954 contract which we quoted earlier herein:

"In connection with operations under this contract, the Contractor shall initiate and take all reasonable steps and precautions to protect health and minimize danger from all hazards to life and property, and shall make all reports and permit all inspections as required by the commission and shall conform to all minimum health and safety regulations and requirements of the Commission." (p. 36)

Turning to Modification No. 114, the post-1954 contract, we find the same con-

cept set forth in Article XII pp. 46–47, also quoted earlier herein:

"The University shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property, and shall comply with all pertinent health, safety, and fire protection regulations and requirements (including reporting requirements) of the Commission communicated to the University."

Reading Article XVIII of Modification No. 19 signed six years before the AEC Act of 1954 along with Article XII of Modification No. 114 signed seven years after the AEC Act of 1954, both of which are between AEC as the employer and the University as the independent contractor, in the light of 10 Code of Federal Regulations Part 20 (pp. 161–187)—"Standards for Protection Against Radiation," Sections 20.1–20.601, and Appendices B, C, and D attached thereto, originally issued November 17, 1960, as amended—makes it crystal clear that the AEC has in these contracts fulfilled all the statutory duties imposed upon it in 42 U.S.C. § 2051 in the arrangements it made with the University and the regulations it issued setting up detailed requirements and standards for "the protection of health and the promotion of safety during research and production activities," by contractually demanding that the University as the independent contractor comply with these pertinent health and safety regulations.

Moreover, the duty of the setting up of standard operating procedures, evacuation procedures, and all other protective health measures was placed upon the University. Although the AEC retained inspection powers, it did not have the staff required actively to participate in drawing up all the necessary operating procedures for safety. It is uncontested that "only a few AEC employees would be available to supervise the health and safety aspects of work performed by some 24,000 contractor employees." Affidavit of John F. Burke, Assistant Manager for Operations, Albuquerque Operations Office, ERDA, February 19, 1976, attached to the Government's Memorandum In Support of Cross Motion for Summary Judgment.

Summarizing, the Court must and does hold that by reason of the 1954 AEC Act, 42 U.S.C. § 2051 and § 2052, the Code of Federal Regulations, sections just cited, 20 C.F.R. §§ 20.1–20.601, the minimal AEC staff at LASL, and the provisions of both the pre-1954 contract and the post-1954 contract between the parties involved—that is, between the AEC and the University—the University is and should be solely responsible for establishing all health and safety provisions and carrying them out on the operational level, and that the AEC properly and scrupulously performed its statutory discretionary and judgmental duties.

The relevant question which remains is whether the Federal statutes which imposed upon the AEC the duties of judgment and discretion in dealing with health and safety measures also necessarily granted it immunization from damages for any operational negligence of the independent contractor.

■ There is no absolutely clear provision in the 1954 Act specifying that the AEC will not be liable for the failure to supervise acts of its managing independent contractors. However, utilizing all available methods of legislative interpretation, the view of this Court is that the 1954 Act must be read as giving the AEC the right and power to delegate to its independent contractors operational duties relating to health and safety, as well as operational duties relating to research and development and training activities as part and parcel of its unique role in discretionary and judgmental control of the atom, atomic energy and nuclear processes. We find support for this position in a number of cases. In *Crowther v. Seaborg*, 312 F.Supp. 1205, 1220 (D.Colo.1970), the Court noted the wide discretion of the AEC in health and safety matters:

"Defendants urge, however, that the phrase 'as the Commission may deter-

mine' places the nature of the arrangements within the agency discretion. The Court agrees with this construction of the statutory language. We note, however, that provision for health and safety is mandatory, since the language is 'shall contain'.

"Thus, the statute requires provision for health and safety, but the exact nature of the arrangements is lodged in the discretion of the AEC."

The obligatory nature of the statute seems to indicate a policy to impose operational duties on the managing independent contractors but to limit the discretionary AEC duties to "arrangements" containing provisions requiring the independent contractors (1) "to protect health, (2) to minimize danger to life or property, and (3) to require the reporting and to permit the inspection of work performed thereunder, as the Commission may determine." 42 U.S.C. § 2051(a)(5), (d). To insure this is done properly, the AEC kept a skeletal and discretionary staff of overseers; yet it obviously did not have the requisite labor force actively to supervise all areas or all details of operational experimentation and production.

The Second Circuit in *Blaber v. United States*, 332 F.2d 629, 631 (2nd Cir. 1964) also concluded:

"Fairly interpreted there is nothing in the statutory language to suggest that the Commission must supervise and protect against manufacturing or experimental hazards of independent contractors with whom it deals. In fact, as stated above, the contract itself reveals that Sylvania [the independent contractor] had primary responsibility for the safety of its employees."

As the *Blaber* court noted, the fact that the AEC did not supervise the independent contractor is consistent with the broad discretion it possesses under the applicable legislation. It would indeed be paradoxical to require that, although the AEC was not obliged to and did not supervise the independent contractor in its operational health and safety procedures at the leased facilities, it could be liable for an accident caused by a failure to supervise. We are not willing to embrace such an anomalous position.

*Blaber* also went on to state:

"The AEC may have considerable power to control the activities of private companies through contracts, but when the Commission decides the extent to which it will undertake to supervise the safety procedures of private contractors, it is exercising discretion at one of the highest planning levels. Decisions of this kind are therefore within the 'discretionary function' exception of 28 U.S.C. § 2680(a)." 332 F.2d at 631

Concomitant with exercising discretion at "the highest planning levels" is the Congressional directive that the AEC enjoy such discretion unhampered or restricted by the application of conflicting or delimiting State law. Imposing a non-delegable duty under New Mexico law here would necessarily, unequivocally, and detrimentally affect the statutory discretion of the AEC.

That this is a correct evaluation of the case before us is, indeed, mandated by the United States Supreme Court in *Dalehite v. United States*, 346 U.S. 15, 33, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), where it relied upon the exception provision of the Federal Tort Claims Act, 28 U.S.C. § 2680(a),[2] in affirming the Circuit Court's reversal (197 F.2d 771 [5th Cir. 1952]) of a District Court judgment against the Government for negligence in performing "discretionary" activities in the storage of FAGN (Fertilizer Grade Ammonium Nitrate), a highly volatile substance which exploded at the harbor in the famous Texas City Disaster.

2. § 2680. Exceptions
The provisions of this chapter and section 1346(b) of this title shall not apply to—
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Moreover, to hold that the AEC has an active duty to participate in the supervision of all the operational projects of its managing contractors would violate the discretion given it by the 1954 Act. The only way to allow the AEC a truly wide discretion in the administration of its contracts is to hold, as the Supreme Court did in *Dalehite* and the Second Circuit did in *Blaber*, that the AEC has the power to delegate to its independent contractors both the responsibilities and the correlative duties with regard to health and safety procedures.

To impose upon the AEC a continuing duty to supervise the details of all health and safety procedures of the independent contractors would be to rewrite the provisions of Federal legislation because of a conflict with State law. This would clearly constitute a restructuring of the contracts, place unwarranted burdens upon both the AEC and its independent contractors, and do so in obvious derogation of the Federal statutes and the Supremacy Clause of the Constitution.

Further, both the pre-1954 contract (Modification No. 19) and the post-1954 contract (Modification No. 114) provide specifically that indemnification by the employer, the AEC, shall be made to the independent contractor, the University, for any injuries that occur in the operation of the facilities and activities at LASL and for which any loss, expense, or damage is suffered by the University.

Thus, Article XI, "Special Hazards," of Modification No. 19, p. 17, provides in great detail, along with Article X, "Reimbursement", p. 12, and Article XII, p. 21, for reimbursement and payment by the AEC to the University for "all costs . . . in carrying out this contract," including loss, expenses, or damages suffered by the University by reason of injuries and damages caused by negligent acts of the University "in connection with the work, and found and certified by the Commission to be just and reasonable, or determined by due process of law." p. 13. Further, Article XIV—"Responsibility of Contractor—Contingencies"—has very detailed provisions contain-

ing indemnification and hold harmless clauses whereby "the Government shall indemnify and hold the contractor harmless against any delay, failure, loss, expenses (including expense of litigation), or damages (including personal injuries and deaths of persons and damage to property) of any kind and for any cause whatsoever, arising out of or connected with the work   . ." p. 29.

And Modification No. 114 contains virtually identical "Reimbursement," "Payment," and "Contingencies" clauses, including particularly Article XIV—"Contingencies—Litigation and Claims," pp. 49–50:

"1.   The Commission deems the performance of the work hereunder by the University to be essential in the interest of the common defense and security of the United States. The Commission and the University recognize that, in part, this work involves unusual, unpredictable and abnormal risks.

2.   In view of these circumstances, it is agreed that all work under this contract is to be performed at the expense of the Government and that the University shall not be liable for and the Government shall indemnify and hold the University harmless against any delay, failure, loss or damage (including personal injuries and deaths of persons and damage to property) and any expenses in connection therewith (including expense of litigation) arising out of or connected with the work,   . . ."

If an injured party could sue the AEC directly, these reimbursement, payment, indemnification and hold harmless clauses would be of little or no value. These clauses obviously contemplate that the University could be and would be directly sued and recovered against in tort and negligence actions; but that, in turn, it could and would recover from the AEC all necessary expenses and losses incurred in the defense of tort and negligence litigation, as well as the amount of any judgments for damages

recovered against the University in such litigation.

There are also strong policy reasons in interpreting the 1954 AEC Act to allow the AEC broad discretion and judgmental choice in the delegation of operational duties and responsibilities in matters of health and safety. The AEC should not be impaired or threatened in terms of its efficiency and costs by doctrines of State law which could potentially change the structure of contracts between the AEC and its managing independent contractors.

Were we to hold that the AEC could not delegate health and safety operational responsibilities and duties to its independent contractors, the AEC might feel compelled to take a much more active role in the setting up of safety standards, evacuation procedures, and miscellaneous health provisions, as well as detailed supervision of operational procedures, which, of course, in turn, would call for a complete restructuring of its contracts covering all of its facilities.

But, even assuming that the AEC would not feel compelled to restructure its contracts with independent contractors, no affirmative reason appears that we grant the plaintiff a right to sue the AEC directly. The plaintiff has sufficient remedies in that he can proceed under the California Workmen's Compensation laws for loss of wages, medical costs, and other losses incurred in a job-related accident. He can also sue the University of California, and if he recovers, the AEC, by statute, must indemnify the University.

To allow Plaintiff to sue the AEC would cut across the plain purpose of the 1954 AEC Act, would deny effect to the Supremacy Clause of the Federal Constitution and would put the plaintiff in no better position than he already had with his right to sue the University as indemnified by the AEC.

The cases and authorities cited and relied upon by the plaintiff are simply not on point. For instance, while *Indian Towing Co. v. U. S.*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), does hold that the Govern-

ment may be liable for negligence of the Coast Guard at the "operational level" of its lighthouse activities by virtue of *Dalehite v. United States*, 346 U.S. 15, 42, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), and while it is further indicated that this can include "governmental" as well as "proprietary" functions, nevertheless, it does not answer the question here where we have *discretionary, judgmental* activities of the AEC which clearly are *not* "operational."

Nor does *Rayonier v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) lend any comfort or support to plaintiff's contentions because, again, like *Indian Towing Company*, it merely holds that negligence in "operational" functions of the U. S. Forest Service in fighting forest fires may make the Government liable in circumstances where private persons would be liable under the laws of the state where the negligence occurs.

Both *Indian Towing* and *Rayonier* merely refuse to apply the familiar distinction between *governmental* and *proprietary* activities historically used by the State courts in negligence cases involving municipal corporations and other public bodies, and do not import this distinction into the Federal Tort Claims arena.

Finally, *Thorne v. United States*, 479 F.2d 804 (9th Cir. 1973) and *United States v. Babbs*, 483 F.2d 308 (9th Cir. 1973) add nothing to what we have already discussed, because they merely state the obvious rule which we have already laid out, that inherently or intrinsically dangerous work or activities of an *operational* nature rather than a *judgmental* or *discretionary* nature cannot be delegated by the Government to an independent contractor where there is no specific Federal statute permitting such delegation.

And the Supreme Court has, in *Dalehite, supra*, 346 U.S. at 33, 73 S.Ct. at 966, 97 L.Ed. at 1439, finalized the distinction between *"discretionary"* or *"judgmental"* activities on the one hand and *"operational"* activities on the other hand; in the former activities rendering the Government, the AEC and other agencies of the Government

immune from suit, for the negligent performance thereof; and in the latter activities laying them open to suit, for such negligent performance.

## ORDER

1. By reason of and in accordance with the foregoing Decision, which shall also constitute findings of fact and conclusions of law, pursuant to F.R.Civ.P. 52, it is hereby ordered that counsel for the defendant, United States of America, prepare, serve and lodge formal Findings of Fact, Conclusions of Law and separate Judgment herein as orally ordered by the Court on March 15, 1976.

2. The Clerk is hereby directed to serve copies of this Decision upon the parties herein by serving their respective counsel of record.

LET JUDGMENT BE ENTERED ACCORDINGLY.