**J. D. WILLIAMS, Plaintiff-Appellant,**

v.

**FENIX & SCISSON, INC.,
Defendant-Appellee.**

No. 76–1452.

United States Court of Appeals,
Ninth Circuit.

Sept. 24, 1979.

Lester W. Miller, Anchorage, Alaska, for plaintiff-appellant.

Burr, Pease & Kurtz, D. A. Burr, Anchorage, Alaska, for defendant-appellee.

Before WRIGHT, KENNEDY and TANG, Circuit Judges.

TANG, Circuit Judge.

This is an appeal from the judgment of the district court denying plaintiff's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Jurisdiction exists pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1291. We affirm.

The plaintiff, J. D. Williams, was injured while working on a drilling rig at Amchitka Island, Alaska. He sued Fenix & Scisson, Inc. for negligence, alleging Fenix & Scisson had undertaken a duty both voluntarily and contractually to oversee and supervise his work. At the close of trial, the trial judge ruled that Fenix & Scisson had no contractual duty toward the plaintiff; hence, the issues presented to the jury were whether Fenix & Scisson had voluntarily assumed a duty to the plaintiff to oversee his work; whether Fenix & Scisson was negligent in performance of that duty; and whether the negligence proximately caused the plaintiff's injury. The jury returned a verdict in favor of the defendant.

Plaintiff's motion for judgment n.o.v. or, in the alternative, for a new trial were denied. On appeal, the plaintiff urges that the trial court erred in two respects. First, he alleges that the trial court improperly ruled on the issue of contractual duty to supervise. Second, the court erred in refusing to qualify a particular witness as an expert. We have considered these issues and affirm.

As a preliminary matter, we note that a motion for judgment n.o.v. may be entertained only if the movant has made a motion for a directed verdict at the close of all the evidence. Rule 50(b), Fed.R.Civ. Pro.; 5A Moore's Federal Practice, ¶ 50.08. The record discloses that plaintiff never moved for a directed verdict. Therefore, his motion for judgment n.o.v. has no legal effect, and we will treat his motion solely as one made for a new trial. *Sears v. Pauly*, 261 F.2d 304 (1st Cir. 1958), Rule 59(a), Fed.R.Civ.Pro.

*The Contractual Issue* :

The following facts are necessary to determine whether Fenix & Scisson had any contractual duty to the plaintiff. Williams, the plaintiff, was employed by Parco, Inc. and was not employed by Fenix & Scisson. Both Parco and Fenix & Scisson were each prime contractors that had individually contracted with the Atomic Energy Commission (AEC) for work at Amchitka Island. The AEC contracted with Parco to drill certain test holes at Amchitka in conjunction with hydrological testing. The AEC contracted with Fenix & Scisson to furnish engineering services in connection with the drilling and mining operations at the island. At the time Williams was injured, there were seven Parco employees on the job, including Williams, and one Fenix & Scisson employee on the job. The injury occurred while Parco employees were using an air hoist line and chain to lift a thirty foot section of pipe from a storage hole on the drilling rig. The pipe slipped as it was being lifted and hit Williams, causing severe injuries. Williams alleged the pipe was handled in a negligent manner. Whether Fenix & Scisson had a contractual obligation to Williams to see that the pipe was handled in a safe manner is the question before the Court.

The plaintiff contends that two provisions of the contract between the AEC and Fenix & Scisson established a contractual duty towards the plaintiff. The first provision, paragraph 12 of the contract, required that Fenix & Scisson inspect drilling operations

at Amchitka and recommend any improvements to the AEC.[1] The second provision, paragraph A–27, required Fenix & Scisson to take reasonable safety precautions in the performance of its work. This second provision was essentially a "boilerplate" paragraph which was also found in the contract between Parco, Inc. and the AEC.[2] The plaintiff argues further that the contract was supplemented with a letter from the AEC to Fenix & Scisson whereby Fenix & Scisson had the responsibility for "overall industrial safety" and, furthermore, to report directly to the AEC.[3]

■■ This contract was one entered into solely between the AEC and Fenix & Scisson, an independent contractor. The plaintiff presumes that if these contractual provisions were breached by Fenix & Scisson, then liability flows to him as a matter of course. However, neither Williams, nor his employer, Parco, Inc. was a party to this contract. Since Williams was not a party to the contract, the primary question is whether Williams was an intended third party beneficiary of the contract between the AEC and Fenix & Scisson. It is a general rule of law that before recovery can be had under a contract by a third party, he must show that the contract was made for his direct benefit. *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912); *King v. National Industries, Inc.*, 512 F.2d 29 (6th Cir. 1975); *Martinez v. Phillips Petroleum Co.*, 283 F.Supp. 514 (D.Idaho 1968), aff'd. 424 F.2d 547 (9th Cir. 1970). There are three types of third party beneficiaries: donee beneficiaries, creditor beneficiaries, and

incidental beneficiaries. *Isbrandtsen Co. v. Local 1291, Etc.*, 204 F.2d 495 (3rd Cir. 1953). Only creditor and donee beneficiaries have potential rights under a contract:

"A third party . . . has an enforceable right by reason of a contract made by two others (1) if he is a creditor of the promisee or of some other person and the contract calls for a performance by the promisor in satisfaction of the obligation; or (2) if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract. A third party may be included within both of these provisions at once, but need not be. One who is included within neither of them has no right, even though performance will incidentally benefit him." 4 Corbin, Contracts § 776 at 18, 19 (1951) (footnotes omitted).

*Accord, King v. National Industries, Inc., supra; Isbrandtsen Co. v. Local 1291, Etc., supra.*

It is clear that the plaintiff was not a creditor of the promisee (the AEC). Furthermore, plaintiff was not a donee beneficiary since there was no indication in the contract to give the promisor, Fenix & Scisson, "reason to know" that such benefit was contemplated by the AEC as a motivating cause for making the contract.

The contractual provisions required Fenix & Scisson to perform certain inspection and safety duties and then report back to the AEC but there was no duty under any

---

1. Paragraph 12 provided that Fenix & Scisson would:

   "Inspect drilling and mining operations of contractors to determine that work is expeditiously accomplished in accordance with approved plans and specifications, progress schedules and other contractual requirements. Recommend suggested improvements in these areas to the Contracting Officer [the AEC]."

2. Paragraph A–27 provided:

   "The Contractor [Fenix & Scisson] shall take all reasonable precautions in the performance of the work under this contract to pro-

tect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property, and shall comply with all health, safety, and fire protection regulations (including reporting requirements) of the commissions."

3. The pertinent language in the letter provided:

   "The responsibilities of Fenix & Scisson, Inc. . . . are as follows: . . . responsible for overall industrial safety of the AEC prime contract or operations connected with drilling, cementing, logging, well surveying and welding services. Reports directly to the AEC site manager."

provision of the contract to supervise the work of Parco, Inc. It is clear, moreover, that Parco was an independent contractor who was to supervise completely its own employees and drilling operations. In neither the Fenix & Scisson contract nor the Parco contract was there any contractual provision suggesting that either Fenix & Scisson or Parco would provide the other with supervision, personnel, materials, tools or anything else. Any benefit derived from the Fenix & Scisson contract was to the AEC, not Parco or Williams.

The right to inspect to see that provisions of the contract are carried out and the right to require safety regulations to be followed is not such control as to impose liability to the employee of an independent contractor. *See West v. Morrison-Knudsen Co.*, 451 F.2d 493 (9th Cir. 1971); *Moushey v. United States Steel Corp.*, 374 F.2d 561 (3rd Cir. 1967); *DeVille v. Shell Oil Co.*, 366 F.2d 123 (9th Cir. 1966).

We agree with the district court determination that at best Williams was merely an incidental beneficiary of the Fenix & Scisson and AEC contract. As an incidental beneficiary, Williams has no rights under the contract against Fenix & Scisson. The district court properly withdrew this issue from the jury.

Plaintiff seeks to rely on various extrinsic evidence to support his contention that Fenix & Scisson had a contractual duty to him. Such evidence is important only if the contract is ambiguous. *United States v. Haas & Haynie Corp.*, 577 F.2d 568 (9th Cir. 1978). The contract is unambiguous since there is no suggestion whatsoever that Williams was an intended beneficiary of the contract. Contracting parties are presumed to act only for themselves unless there is a clear expression of an intent to benefit a third party. *German Alliance Ins. Co. v. Home Water Supply Co., supra.*

*The Expert Witness Issue:*

Williams further alleges that the trial court erred in refusing to qualify one of his witnesses, Kenneth Willits, as an expert in the proper method of handling the pipe which caused Williams' injury. The trial court was of the view this was not a proper subject for expert testimony. However, the court did allow Kenneth Willits to testify as to his own experience in the handling of the particular pipe involved. He also was allowed to testify as to his personal opinion that the pipe was being handled in an unsafe manner at the time of the accident. Specifically, Willits testified that it would have been safer to use a choker cable to move the pipe rather than to use the chain that was actually used at the time of injury.

A trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action must be sustained unless manifestly erroneous. *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962).

Willits was allowed to testify as to his personal opinion on how to handle the pipe. We find it doubtful that testimony "as an expert" was needed to aid the jury under these facts. Accordingly, we find no error in refusing to qualify Willits as an expert.

Affirmed.

KENNEDY, Circuit Judge, concurring:

I concur in the judgment, but my approach to the case differs in significant respects from that set forth in the opinion for the court. The plaintiff's claim in the district court was that the defendant was guilty of tortious conduct. Under one theory advanced by plaintiff, the obligation to supervise arose because Fenix & Scisson (F&S) voluntarily assumed it. This issue was submitted to the jury; it found for the defendant; and plaintiff has not appealed this aspect of the case. A second rationale for establishing the tort obligation was that F&S undertook by contract to supervise in detail the safety aspects of Parco's drilling operations. My disagreement with the court's opinion is with its conclusion that to succeed the plaintiff must show that it was an intended beneficiary of the contract provisions. That inquiry, I respectfully sub-

mit, is irrelevant under Alaska tort law, which controls here. If the contract between the AEC and F&S obligated it to undertake detailed supervision over the safety aspects of Parco's drilling performance, and if F&S was negligent in performing this duty, then liability arises whether or not plaintiff can be characterized as an intended beneficiary under contract principles.[1]

The critical question, then, is the nature and extent of F&S's duty with regard to Parco's drilling operation.[2] The district court granted partial summary judgment for the defendant, apparently on the grounds that the defendant's contractual undertaking, as shown by the evidence, did not give it a sufficient degree of control over Parco's operation to support liability under Alaska negligence law. On this basis, construing plaintiff's evidence in the favorable light to which it is entitled on an appeal from a summary judgment, I would affirm the trial court's judgment.

Whether one adopts the third-party beneficiary analysis advanced by my colleagues, a theory I suggest is irrelevant,[3] or my view, it is necessary to interpret the contract. On this issue I also take a somewhat different approach to the case.[4] The contract clause that plaintiff asserts creates a duty states as follows:

The Contractor [Fenix & Scisson] shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property, and shall comply with all health, safety, and fire protection regulations (including reporting requirements) of the commissions.

The court, examining only the express language of the contract, concludes that this provision does not reveal an intent that employees engaged in drilling operations are intended third-party beneficiaries of F&S's performance. The majority fails to consider substantial extrinsic evidence, offered by plaintiff in the district court proceedings and discussed at greater length below, which would aid in interpreting the intent of the parties. Its reason is that the words of the contract are unambiguous.

This approach to contractual interpretation has been rejected by this circuit and it is out of line with better-reasoned contract law cases. It results in the exclusion of evidence clearly probative of the parties' understanding of their obligations. Examination of the circumstances which gave rise to the agreement, and of subsequent acts and communications which bear on the parties' intent at the time of contracting, are

---

1. The plaintiff has not argued on this appeal that even if F&S did not undertake by contract a degree of control sufficient to impose liability under Alaska tort law, negligent performance of the duties it did undertake—inspection and reporting to the AEC, for instance—caused plaintiff injury.

2. This is not a case where a statute creates a duty of safety for an employer and provides that violations can be remedied by a criminal action or a civil suit brought by a state agency, see, e. g., Morris v. Soldotna, 553 P.2d 474, 476–77 (Alaska 1976). In such a case a kind of third-party beneficiary inquiry may be appropriate to determine if the statute created an implied private cause of action in favor of injured employees.

3. Although not the foundation of plaintiff's case, a third-party beneficiary analysis might nevertheless be relevant to the tort theory. The inference that F&S agreed to undertake detailed supervision of Parco's safety opera-

tions would of course be strengthened by evidence that Parco employees, such as the plaintiff Williams, were intended beneficiaries of the contract between the AEC and F&S. By agreeing to subject itself to breach of contract actions by Parco employees, one might infer that F&S agreed with the AEC to undertake a degree of detailed control over site operations necessary to insure safe working conditions.

4. While it must be kept in mind that Alaska tort law governs the case, I do agree with the apparent holding of the court that interpretation of the contract between the AEC and Fenix & Scisson is controlled as a matter of federal law. See United States v. Seckinger, 397 U.S. 203, 209–10, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); United States v. Western Casualty and Surety Co., 498 F.2d 335, 338 n.4 (9th Cir. 1974); Sam Macri & Sons v. U. S. A. ex rel. Oaks Constr. Co., 313 F.2d 119, 124 n.1 (9th Cir. 1963).

relevant to show the intended meaning of a provision in a contract.

This circuit held as much in *Cordingley v. Allied Van Lines, Inc.*, 563 F.2d 960, 964 n.9 (9th Cir. 1977), when it said, "[t]he interpretation that the parties themselves give a contract, as manifested by their conduct subsequent to formation, is accorded great weight in attempts to ascertain the parties' intent." *Cf. Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1330 (9th Cir. 1975) (federal law).

The majority cites *United States v. Haas & Haynie Corp.*, 577 F.2d 568 (9th Cir. 1978), for the proposition that the court must first examine only the four corners of the contract to see if its terms are "ambiguous," and only upon so finding may it examine extrinsic evidence to illuminate more fully the parties' intentions. In *Haas* the court held that the contract clause in question was "ambiguous" and affirmed the district court's decision to admit extrinsic evidence bearing on interpretation of the clause despite an express integration clause in the contract. In making its finding of ambiguity, the court did not have to look beyond the four corners of the document, since examination of the contract itself disclosed the ambiguity. I do not think the court in *Haas* intended to foreclose a court from examining extrinsic evidence where necessary in order to determine the meaning of language in a contract. Thus viewed, the statement in *Haas* that "[e]xtrinsic evidence is properly admitted to help ascertain the intended meaning of ambiguous writings," *id.* at 572 (citing Restatement (Second) of Contracts § 238), is unobjectionable. As Chief Justice Traynor said in the leading case of *Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 566, 442 P.2d 641, 646 n.8 (1968) (en banc), "[t]his statement of the rule is harmless if it is kept in mind that the ambiguity may be exposed by extrinsic evidence that reveals more than one possible meaning."

The language on which plaintiff relies, obligating F&S in the performance of its duties under the contract to protect the health and safety of employees and members of the public in its performance, is capable of being used to mean what plaintiff claims it meant. The extrinsic evidence should have been considered to aid the court in determining what obligations the parties intended to undertake by agreeing to the provision in question.

The court comments that the contract language alleged to give rise to liability was "boilerplate," because it was also contained in the contract between Parco and the AEC. This point is certainly relevant in determining the intent of the AEC and F&S, but just as certainly is not dispositive. The same language may have different meanings in different agreements, depending on what the parties intend the language to mean.

Under my view, I do not find it necessary to make a judgment whether the extrinsic evidence was sufficient to show that plaintiff was an intended beneficiary, but if my brothers choose to rely on the third-party beneficiary argument, I think it necessary for their conclusion to consider such evidence in determining the parties' intent.

I turn now to what is to me the important question raised on this appeal by plaintiff: what obligations with respect to drilling safety did F&S undertake in its contract with the AEC? As I argued above in connection with the majority's treatment of the third-party beneficiary issue, I would consider the extrinsic evidence in interpreting the party's contractual obligation, keeping in mind that this evidence is relevant to show what obligations the parties agreed in the contract to undertake, not what duties F&S in fact performed—a determination made by the jury below and not appealed.

The contract between F&S and the AEC obligated F&S to provide various engineering services in connection with the drilling and mining activities at the Amchitka site. F&S agreed to inspect the site and report to the AEC concerning compliance with contract specifications. Paragraph 1.a., subparagraph (12) required F&S to:

Inspect drilling and mining operations of contractors to determine that work is

expeditiously accomplished in accordance with approved plans and specifications, progress schedules and other contractual requirements. Recommend suggested improvement in these areas to the Contracting Officer.

The contract provision, quoted in part above, provides:

*A–27. SAFETY, HEALTH AND FIRE PROTECTION*

The Contractor shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property, and shall comply with all health, safety, and fire protection regulations and requirements (including reporting requirements) of the Commission. In the event that the Contractor fails to comply with said regulations or requirements of the Commission, the Contracting Officer may, without prejudice to any other legal or contractual rights of the Commission, issue an order stopping all or any part of the work; thereafter a start order for resumption of work may be issued at the discretion of the Contracting Officer. The Contractor shall make no claim for an extension of time nor for compensation or damages by reason of or in connection with such work stoppage.[5]

This clause, if considered by itself, would appear to grant no right to supervise or control the safety aspects of Parco's drilling operations. Rather, it appears to impose a duty on F&S to perform its own contractual obligations, specified in the rest of the contract, with reasonable care. As noted above, other contract provisions obligated F&S only to conduct safety inspections and report the results to the AEC.

Plaintiff's extrinsic evidence, however, suggests that F&S and the AEC understood that under the contract F&S obligated itself to do more than inspect and report.

The extrinsic evidence consisted of subsequent correspondence between F&S, the AEC, and of F&S's behavior at the drilling site. First, plaintiff introduced a letter written by the AEC to F&S outlining the safety responsibilities of two of its prime contractors. The subject of this letter was "Industrial Safety Responsibilities—Amchitka Island, Alaska," and it provided as follows:

The responsibilities of Fenix & Scisson, Inc., and Holmes & Narbor, Inc., at Amchitka and the ports of embarcation are as follows: Fenix & Scisson, Inc.

. . . Amchitka: responsible for overall industrial safety of the AEC prime contract or operations connected with drilling, cementing, logging, well surveying and welding services. Reports directly to the AEC site manager. Holmes & Narbor, Inc. . . . Amchitka: responsible for the overall industrial safety coverage of all construction and support activities on the island, . . Your cooperation in meeting these responsibilities at the POE and at Amchitka will be appreciated.

F&S responded by distributing an in-house document entitled, "Industrial Safety Program." It stated: "This company has been specifically charged with overall responsibility for industrial safety with respect to all AEC prime drilling and mining related contracts or operations at Amchitka and Tonopah." The memo continues by referring to the company's responsibility for inspecting AEC prime drilling operations and reporting potential hazards to the respective contractors for their information and action.

Several Parco and F&S employees also testified. This testimony, if believed, would show that various Parco employees understood that F&S had some kind of control over safety at the drilling site; that if F&S told them to take a particular safety measure they were to follow instructions; and that on perhaps three or four occasions an F&S employee gave directions to Parco employees to change the manner of Parco's performance in order to increase safety.

---

5. As the parties have explained this provision to us, the "Contracting Officer" referred to, who may order work stopped, is an AEC employee unaffiliated with F&S.

While substantial contrary evidence was introduced by defendant, for purposes of evaluating the propriety of the district court's grant of summary judgment these facts should be construed favorably to the plaintiff.

Plaintiff's evidence, as it bears on interpretation of the contract, is capable of being understood to show that F&S agreed to undertake a limited role in prescribing certain corrective measures to improve safety at the drilling site. I would hold that these contractual obligations undertaken by F&S are insufficient as a matter of Alaska tort law to impose liability on F&S. The Alaska courts have held that the power to inspect for safety violations, to require compliance with contractual safety obligations, and to prescribe some alteration in the work to comply with safety rules, is insufficient control to justify imposing liability on the employer of an independent contractor. F&S of course did not employ Parco, but its relationship vis-a-vis Parco is for our purposes similar to one who employs an independent contractor.

In *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933 (Alaska 1968), Mobil, the employer of the independent drilling contractor, retained the rights, among others, temporarily to suspend drilling operations, terminate the contract, control the drilling operations, and terminate employees of the independent contractor. On at least two occasions Mobil directed the work of the independent contractor. The court held that a question for the jury existed as to whether Mobil had retained such a right of supervision that the independent contractor was not entirely free to do the work in its own way. While the precise outlines of F&S's responsibilities under the agreement with the AEC are not clear, even considering the extrinsic evidence, F&S retained substantially less control over Parco's operations than Mobil did over the independent contractor in *Hobbs*.

This case resembles *Morris v. Soldotna*, 553 P.2d 474 (Alaska 1976). In that case the employer of the independent contractor was held to have retained so little control over the work of the independent contractor that a directed verdict against the plaintiff was held appropriate. In describing the powers retained by the employer, the court said:

> [The employer of the independent contractor] had an employee at the job site serving in a supervisory capacity; however, . . . neither of these supervisors nor any other employee of appellees directed the work of Custom Painting's employees in any respect. While Anderson's construction superintendent questioned Morris about his painting procedure, he did not instruct Morris that a particular method should be used.
>
> .    .    .    .    .
>
> [A]ppellant contends that the contracts between the parties imposed upon appellees certain standards regarding safety. .    .    . Our review of the contracts in this case indicate that they contain the standard boilerplate provisions with respect to safety. .    .    . [T]he contracts in question did not provide for affirmative duties in connection with safety. Since appellees could not incur a duty to Custom Painting's employees merely by reserving the right to conduct safety inspections *or to prescribe safety requirements*, we are of the view that the trial court did not err in finding the contracts irrelevant.

*Id.* at 479–80 (emphasis added). Perhaps F&S agreed to undertake slightly more responsibility than the employer retained in *Morris*. I conclude, however, that an Alaska court would find this case governed by *Morris*. *See also DeVille v. Shell Oil Co.*, 366 F.2d 123, 126 (9th Cir. 1966) (Alaska law); *State v. Morris*, 555 P.2d 1216, 1218–19 (Alaska 1976).

The facts of each differ,[6] but the cases cited above are sufficient for me to con-

---

**6.** I readily concede that the test developed by the Alaska courts and generally accepted in other jurisdictions—how much and what kind of control was retained and exercised by the employer of the independent contractor—is hardly precise.

clude that an Alaska court would find that no reasonable person could conclude that the AEC delegated to F&S, and F&S agreed to undertake, the degree of control over Parco's operations which Alaska law requires it to have for negligence liability to be imposed. On that basis, I would affirm the judgment of the district court.[7]

**7.** My conclusion is consistent with this circuit's recent decision in *Bramer v. United States*, 595 F.2d 1141 (9th Cir. 1979). The facts of *Bramer* resemble the facts of this case, but the issues decided differ substantially. Pursuant to 42 U.S.C. § 2051(a), the AEC contracted with the University of California to manage and operate the Los Alamos Scientific Laboratory, a nuclear research facility owned by the United States. The contract between the AEC and the University contained the same safety clause as the contract between the AEC and F&S. The plaintiff, an employee of another AEC independent contractor, was injured as a result of negligent safety precautions. Plaintiff sued the United States, arguing that even if the Government had attempted to delegate completely to the University responsibility for safety at the site, it was nevertheless liable under the "nondelegable duty" doctrine which applies to employers of independent contractors where the work is inherently dangerous or involves a peculiar risk of injury unless special precautions are taken. The court held that under New Mexico law the United States could not be held liable to the plaintiff under the nondelegable duty doctrine.

In describing the contract clause in question, the court said that it

placed the responsibility for safety precautions upon the University, and gave the AEC the right to inspect and to stop work for failure to comply with safety regulations.

Because of the contractual delegation of safety responsibilities to its independent contractors, the AEC apparently maintains only a very small staff to oversee this and several other contracts.

595 F.2d at 1142.

Other clauses in the contract, discussed in the district court's opinion, *see Bramer v. United States*, 412 F.Supp. 569 (C.D.Cal.1976), make it clear that the University, as operator of the site, had major day-to-day control over the safety aspects of the site. The AEC retained few safety responsibilities, primarily the power to inspect the site. Thus the relationships between the AEC, the "safety" independent contractor (the University and F&S), and the injured party (an employee of another independent contractor at the site) differ materially in the *Bramer* case and our case. The court in *Bramer* did not hold, and properly so, that the general "boilerplate" safety clause, even as interpreted by extrinsic evidence, *was intended* by itself to oblige the University, or F&S in our case, to supervise in detail the safety aspects of work performed by other AEC independent contractors at the site. In addition, the court recognized the general rule that "neither the reservation of a right to inspect and approve of the work of an independent contractor nor actual inspection, even if allegedly negligent, alone subjects the government to liability." 595 F.2d at 1146 n.11.