PUBLIC AGENCIES OPPOSED TO SOCIAL SECURITY ENTRAPMENT, et al., Plaintiffs,

v.

Margaret HECKLER, Secretary, Department of Health and Human Services, et al., Defendants.

STATE OF CALIFORNIA, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Nos. Civ. S–83–406 LKK, Civ. S–83–776 LKK.

United States District Court, E.D. California.

May 29, 1985.

 

Betsy Grey, Atty., Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

Paul Dobson, Deputy Atty. Gen., Sacramento, Cal., for State of California.

Ernest Schulzke, Sacramento, Cal., for plaintiffs in No. Civ. S–83–406 LKK.

## ORDER

KARLTON, Chief Judge.

The above captioned cases are currently before the court on cross motions for summary judgment, preliminary injunctions, and dismissal. The motions are disposed of in this Memorandum and Order.

## SYNOPSIS

For several years, many political subdivisions of the State of California ("the public agencies") have voluntarily participated in the Old Age, Survivors, and Disability Insurance Benefits program of the federal Social Security Act. The federal and state statutes governing the public agencies' participation permitted them to withdraw from the program so long as they satisfied certain termination requirements. On April 20, 1983, the Congress amended that portion of the federal statute which permitted the public agencies to withdraw. The public agencies and the State then sued the United States and the administrators of the Social Security program, challenging the constitutionality of the amendment. They argued that the amendment constituted an illegal tax upon the State, and that various constitutional rights of the State, the public agencies and their employees were violated by passage of the 1983 amendment. Those challenges to the amendment are currently before the court.

Among the constitutional arguments proffered, the public agencies allege that the April, 1983 amendment effected a taking of their contract rights without just compensation. In resolving this issue, I am mindful of my duty to construe statutes as constitutional. I am also mindful of the fact that the statute I consider was enacted

by Congress as part of a comprehensive package of legislation dealing with the intractable problem of ensuring the financial viability of one of the most important social programs adopted by the federal government. Nonetheless, and no matter with what circumspection a judge approaches the task, under our system it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

With all the deference to which an act of Congress is entitled, I nonetheless conclude in this opinion that, as against the United States, the public agencies were vested with the contractual right to withdraw from Title II, that this right constitutes "private property" within the meaning of the Just Compensation Clause of the Fifth Amendment, and that this property was taken from them by the United States without the "just compensation" mandated by that clause. I further determine, however, that to award just compensation in this case would frustrate the very purpose Congress had in passing the statute. Accordingly, I find that to comply with the provisions of the Constitution and to honor the evident intent of Congress I must declare the statute unconstitutional and of no effect to the degree that it prevents the State and its public agencies from withdrawing from the program.

Lest this Opinion be read too broadly, I briefly pause to clarify what this case is *not* about. This case does not involve mandatory participation in the Social Security system by the State of California or its public agencies. It may be assumed without deciding, that Congress could force the State and public agencies to provide Title II benefits to their employees, since the welfare of all United States citizens is of concern to the entire nation. *See Garcia v. San Antonio Metropolitan Transit Authority*, — U.S. —, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). It may be assumed

(without deciding) that such an imposition might pass constitutional muster even though the Agreement permits the State to withdraw from the *contract*. In such a case, the State's *contractual* right to withdraw would appear to be unaffected (thus a Just Compensation claim might be avoided), but the termination right would do the State no good since it would then be under a *statutory* obligation to participate in the Program. This is not, however, the situation presented here. In the case before this court, the Congress has specifically divested the State and its public agencies of their contractual right to terminate their participation in the Program; it has further instructed the Secretary to effectuate that divestment by directing her to refuse to accept any otherwise properly tendered notifications of withdrawal. It is to this statutory scheme that the lawsuits are tendered and it is only this question which is addressed.

## I.

### FACTUAL BACKGROUND

Effective January 1, 1951, the State of California ("the State") and the United States executed an agreement ("the Agreement") pursuant to 42 U.S.C. § 418(a)(1) under which the Old Age, Survivors, and Disability Insurance Benefits program of the Social Security Act ("the Program" or "Title II") would be extended to public employees if and when the State and its eligible public agencies chose to include them. (*POSSE* Complaint Exhibit "A"; *CALIFORNIA* Complaint Exhibit "A"). As required by the federal statute in effect at the time the Agreement was executed, the Agreement permitted the State to withdraw any coverage group[1] of its public employees upon two years' advance notice to the Secretary.

Pursuant to the statute, the Agreement required the State to make certain payments to the United States Treasury to

---

1. For purposes of this case, a "coverage group" is the eligible employees of the plaintiff public agencies. *See* 42 U.S.C. § 418(b)(5)(B) & (D).

finance its participation, and the participation of its public agencies. The Agreement provided that the State would pay into the United States Treasury, "amounts equivalent to the sum of the taxes which would be imposed under the Federal Insurance Contributions Act." (Agreement, *as amended* April 13, 1955, *CALIFORNIA* Complaint Exhibit "A").

In order to carry out its end of the bargain, the State enacted enabling legislation. *See* Cal.Gov't Code §§ 22000–22603 (West 1980 & Supp.1985). Pursuant to the Agreement and that legislation, the State entered into individual agreements with those of its public agencies wishing to participate in the Program. The public agencies became enrolled in the program when the State and the United States modified the State/federal agreement to include them. *See* 42 U.S.C. § 418(c)(4). The public agencies were required by the state's enabling legislation to make certain "contributions" to the State as payment for their participation. *See* Cal.Gov't Code §§ 22551–53 (West 1980 & Supp.1985). As permitted by that legislation, the public agencies could withdraw from coverage (and concomitant liability to the state), upon two years' advance notice to the State. *See* Cal.Gov't Code § 22310 (West Supp.1985).

In sum, the United States agreed to enroll any public agency whose participation the State requested, so long as the State paid for the participation. In turn, the State agreed to enroll any public agency which requested it, so long as the public agency reimbursed the State for the costs of its participation. In an apparent attempt to avoid getting caught paying for

public agencies which had already withdrawn from the Program, the State prohibited the public agencies from withdrawing except on the same terms and conditions (essentially) upon which the State itself could terminate their enrollment. Thus, in effect, the public agencies were permitted to withdraw only if the State could terminate their enrollment, thus ending the State's own liability for the public agencies' participation.

In April of 1983, Congress enacted section 103(a) and (b) of Public Law 98–21 (*see* 42 U.S.C.A. § 418(g) (West Supp.1985)). This amendment deleted that part of the former statute which permitted the State to terminate the agreement, and to terminate coverage for any set of its public employees. The amendment provided that any state participating at the time of enactment could not withdraw under any circumstances. It also purported to invalidate any notices of withdrawal which had already been filed, but which had yet to go into effect.[2] The State had already submitted notices of voluntary withdrawal from the Social Security system on behalf of several of its public agencies.

These two related suits were filed to challenge that part of the enactment which prohibited the State from exercising the "escape clause" of the contract and thereby withdrawing from Title II.

## II. THE PARTIES

The plaintiffs in *P.O.S.S.E. v. Secretary of H.H.S.* (Civ. S–83–406 LKK) ("POSSE") are several public agencies of the State of California, their employees and local taxpayers, and a group called Public Agencies Opposed to Social Security Entrapment

---

**2.** The challenged enactment reads:

(a) Section 218(g) of the Social Security Act [42 U.S.C. § 418(g)] is amended to read as follows:

"Duration of Agreement

"(g) No agreement under this section may be terminated, either in its entirety or with respect to any coverage group, on or after the date of the enactment of the Social Security Amendments of 1983.".

(b) The amendment made by subsection (a) shall apply to any agreement in effect under

section 218 of the Social Security Act on the date of the enactment of this Act [the Social Security Amendments of 1983], without regard to whether a notice of termination is in effect on such date, and to any agreement or modification thereof which may become effective under such section 218 after that date. P.L. 98–21, section 103 (April 20, 1983), 97 Stat. 65, 71–72, *reprinted at* [1] U.S.Code Congr. & Admin.News 1983, p. 143, (98th Congr., 1st Sess., 1983).

("POSSE"), who seek declaratory and injunctive relief against the defendant United States, the Secretary of Health and Human Services, and others.

For purposes of these cases, a "public agency" is "any city, county, city and county, district, municipal or public corporation, or any instrumentality thereof." Cal.Gov't Code § 22009 (West Supp.1985). The original public agency plaintiffs are three Special Districts organized under the laws of California. They are Yorba Linda Library District,[3] North Bakersfield Recreation and Park District,[4] and Delano Mosquito Abatement District.[5] By order of November 17, 1983, the plaintiffs were granted leave to join additional plaintiffs. The plaintiffs joined were five general law cities,[6] one charter city,[7] and eleven additional Special Districts.[8]

The POSSE plaintiffs name as defendants, the United States and the Secretary and Undersecretary of the federal Department of Health and Human Services. The Secretary is the successor in interest to the original federal signator to the Agreement with the State, and the federal official responsible for implementing Title II. In addition, the plaintiffs name as "Real Parties in Interest," the State of California, its Governor, the Board and its members, and the State's Director of Finance, all in their official capacities as the entities and officials charged by state law with administering the State's participation in the Title II program. At oral argument, plaintiff explained that the "Real Parties in Interest" were named as defendants.

The sole plaintiff in *California v. United States* is the State of California. It names as defendants, the United States, and the Secretary and Undersecretary of the federal Department of Health and Human Services. All defendants in both actions are referred to, collectively, as "the Secretary."

## III. THE CLAIMS & RELIEF SOUGHT

### A. *P.O.S.S.E.*

According to the POSSE plaintiffs, the enactment of P.L. 98–21 prevents them from terminating their formerly voluntary participation in the Social Security program. They seek both an injunction to enjoin the Secretary from enforcing the law on the grounds that it is unconstitutional, and a declaratory judgment to that effect. They also seek "specific performance" of the government's contractual obligations.

The public agency POSSE plaintiffs (hereinafter collectively referred to as "the public agencies") predicate their claims upon four constitutional grounds, and what appears to be a suit for breach of contract. The public agencies assert first, that the

---

**3.** Library Districts are public agencies organized under Cal.Educ.Code §§ 19400–19432 (West 1978 & Supp.1985).

**4.** Recreation and Park Districts are public agencies organized under Cal.Pub.Res.Code §§ 5780–5788.13 (West 1984 & Supp.1985).

**5.** Mosquito Abatement Districts are public agencies organized under Cal. Health & Safety Code §§ 2200–2360 (West 1979 & Supp.1985).

**6.** A "general law" city is a city "organized under the general law" of the State, and a public agency. Cal.Gov't Code § 34102 (West 1968). The general law cities added were Alturas, Arcata, Lincoln, San Clemente, and San Anselmo.

**7.** A "charter" city is a city "organized under a charter." Cal.Gov't Code § 34101 (West 1968). The charter city added was Redondo Beach.

**8.** The Special Districts added were: Aromas Tri-County Fire Protection District (*see* Cal.Health & Safety Code §§ 13801–999 (West 1984 & Supp.1985) ); Bear Mountain Recreation and Park District; Big Bear Municipal Water District (*see* Cal.Water Code §§ 71000–3001 (West 1966 & Supp.1985) ); Humboldt Community Services District (*see* Cal.Gov't Code §§ 61000–802 (West 1983 & Supp.1985) ); Marin Municipal Water District; Paradise Irrigation District (*see* Cal.Water Code §§ 20500–9978 (West 1984 & Supp.1985) ); Paradise Recreation and Park District; Pico Water District (*see* Cal.Water Code §§ 34000–8501 (West 1984 & Supp.1985) ); Placential Library District; Rancho Simi Recreation and Park District; and Sispuedes Fire Protection District.

defendants have deprived them of their "contract rights" without the just compensation required by the Just Compensation Clause of the Fifth Amendment.[9] Second, they assert that the enactment deprives them of their contract rights without the due process of law guaranteed by the Due Process Clause of the Fifth Amendment.[10] They assert as a third ground, that through the challenged enactment, the defendants have attempted to regulate "essential state and local government functions," in violation of the Tenth Amendment.[11] Finally, the public agencies appear to assert that the government has committed a breach of contract for which they seek a remedy in specific performance.

The individual POSSE plaintiffs assert that the defendants have denied them the equal protection of the laws guaranteed by the Due Process Clause of the Fifth Amendment.[12]

### B. *The State*

The State seeks to enjoin enforcement of the statute on the grounds that it is unconstitutional, as well as a declaratory judgment of the statute's unconstitutionality. It also seeks relief in the form of mandamus. The State predicates its claims for relief upon two constitutional grounds. It alleges first, that the defendants acted in excess of any powers granted them by the Constitution by (1) breaching their contractual obligations to the State, and (2) impairing the State's ability to structure its relationships with its own public employees. Second, the State alleges that the defendants violated its sovereign rights under the Tenth Amendment by reason of the two acts just enumerated.

## IV. SUBJECT MATTER JURISDICTION

The federal defendants move to dismiss this case pursuant to Fed.R.Civ.P. 12(b)(1), asserting a lack of subject matter jurisdiction in this court pursuant to the Anti Injunction and Declaratory Judgment Acts. The defendants argue that this suit seeks to enjoin the collection of federal taxes, and that such actions may not be brought in federal court. *See* I.R.C. § 7421(a); 28 U.S.C. § 2201. The defendants suggest in their papers that some of the plaintiffs lack constitutional standing to assert these claims. *See* Fed.R.Civ.P. 12(h)(3). I turn to the standing issue first.

## A. CONSTITUTIONAL STANDING

At the outset, the court is confronted with a problem of the plaintiffs' constitutional standing to challenge the validity of the statute. As noted, the POSSE plaintiffs are public agencies, and their employees and residents within their respective jurisdictions. Yet, by its terms, the statute they challenge appears to abrogate only an agreement between the State and the federal government (assuming *arguendo* that it abrogates any agreement at all). Since the contract alleged to have been breached by the defendants is a contract with a party other than any of these plaintiffs, the question arises whether the POSSE plaintiffs have a sufficient interest in the Agreement so as to confer upon them "standing" in the constitutional sense, to challenge a federal statute which allegedly abrogates it. Moreover, the "contract rights" allegedly taken by the defendants facially ap-

**9.** "[N]or shall private property be taken for public use without just compensation." U.S. CONST. amend. 5.

**10.** "No person shall be ... deprived of life, liberty or property, without due process of law." U.S. CONST. amend. 5.

**11.** "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respec-

tively, or to the people." U.S. CONST. amend. 10.

**12.** The Due Process Clause of the Fifth Amendment contains an equal protection component which protects individuals from governmental discrimination so arbitrary that it violates substantive due process. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *United States v. Yazzie,* 693 F.2d 102,

pear to be property only of the State, if indeed they are property at all.[13]

### 1. *Standards*

#### a. *Procedural Standards*

■ Standing is an issue addressed to the allegations of the complaint. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Plainly, the court may not decide the merits of the case in order to decide whether or not it may reach the merits. Therefore, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Id.* at 501 (citing *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969) ); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979) (quoting *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206).

#### b. *Substantive Standards*

■ This court has had occasion recently to explore at great length the questions of standing. *See Sierra Club v. Watt,* 608 F.Supp. 305 (E.D.Cal.1985). The court will not again set out at length its understanding of the law, but will merely summarize it as relevant to the instant case. As noted in *Sierra Club,* standing is composed of two components; one constitutional in dimension, the other prudential.[14] *Warth v. Seldin,* 422 U.S. at 498, 95 S.Ct.

at 2204. The question of constitutional standing is one of "justiciability." *Id.* As such, it goes to the court's Article III power to adjudicate the claims asserted.[15] *Id.; Preston v. Heckler,* 734 F.2d 1359, 1363–64 (9th Cir.1984). The Supreme Court has articulated the relevant inquiry as follows:

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.

*Warth v. Seldin,* 422 U.S. at 498–99, 95 S.Ct. at 2205 (citing *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) ); *EMI, Ltd. v. Bennett,* 738 F.2d 994, 996 (9th Cir.) (quoting *Joyner v. Mofford,* 706 F.2d 1523, 1526 (9th Cir. 1983) ), *cert. denied,* —— U.S. ——, 105 S.Ct. 567, 78 L.Ed.2d 698 (1984).

■ In short, "[t]o comply with Article III, the plaintiff must show: (1) a distinct and palpable injury, (2) a causal connection between the injury and the defendant's conduct, and (3) a substantial likelihood that the relief requested will redress the injury." *NAACP, Western Region v. City of Richmond,* 743 F.2d 1346, 1350 (9th Cir.1984) (citing *Valley Forge Christian College v. Americans United for Separa-*

---

103 n. 2 (9th Cir.1982), *cert. denied,* 459 U.S. 1222, 103 S.Ct. 1231, 75 L.Ed.2d 464 (1983).

**13.** The defendants do not challenge the State's standing, but the State has not made a Just Compensation claim.

**14.** The defendant's attack appears to be restricted to the constitutional component.

**15.** Article III standing refers to the constitutional limitations imposed upon the federal court's exercise of subject matter jurisdiction. *See Fors v. Lehman,* 741 F.2d 1130, 1132 (9th Cir.1984) (citing *Allen v. Wright,* —— U.S. ——, 104 S.Ct.

3315, 82 L.Ed.2d 556 (1984) ). The relevant part of Article III reads: "The judicial Power shall extend to all Cases ... arising under [the] Constitution [and] Laws of the United States; [and] to Controversies to which the United States shall be a Party." U.S. CONST., art. III, § 2. As a result of this constitutional provision, this court does not have jurisdiction over this claim in the absence of a case or controversy; the standing doctrine is one component of that requirement. *Preston v. Heckler,* 734 F.2d 1359, 1363 (9th Cir.1984).

*tion of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

## 2. *Resolution of the Standing Issue*

### a. *The State*

■ The State meets the requirements for standing as to both of its claims. Its complaint alleges that the defendants' actions have caused them a "distinct and palpable" injury, to wit, a deprivation of its ability to structure its employment relationships with its public employees which it claims is an infringement on its sovereignty as a state, and a breach of its contract.

Whether the injury to its employment relations is in fact sufficient to permit the State ultimately to prevail is a question which goes to the merits. For standing purposes, it is sufficient that the State alleges a judicially cognizable interest in the preservation of its own sovereignty, and a diminishment of that sovereignty by the alleged interference in its employment relations with its public employees. *But see Garcia v. San Antonio Metropolitan Transit Authority,* — U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), *overruling National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

For standing purposes, whether or not the State's own sovereignty is actually infringed by the inability of its public agencies to withdraw from the social security program is not to be challenged in the context of this motion. Rather, this is a question going to the relationships between the state and its public agencies, and thus a question to await a determination on the merits. In California, this turns out to be a difficult inquiry most inappropriate for resolution at this threshold stage. *Cf. Moor v. County of Alameda,* 411 U.S. 693, 717–22,

93 S.Ct. 1785, 1799–02, 36 L.Ed.2d 596 (1973).

The remaining aspects of the State's standing are not challenged, and the court finds that they are not subject to serious attack.

### b. *The Public Agencies*

■ While the public agencies' constitutional standing is more problematic, the court is satisfied that they have standing to assert the Just Compensation claim pressed in their complaint. The only serious challenge to the public agencies' standing arises because it appears that they were not contracting parties to the allegedly breached contract upon which they predicate their Just Compensation claims. Normally, the court would simply assume the allegations of the complaint to be true. *See* § IV(A)(1)(a), *supra.* In these cases, however, the plaintiffs have attached copies of the Agreement to the complaints as Exhibits. Therefore, in resolving the standing issue on the allegations of the complaint, I may also examine the Agreement itself. *See* Fed.R.Civ.P. 10(c).[16]

### i. *Distinct and Palpable Injury*

The public agencies allege that their property is protected by the Just Compensation Clause and was taken by the Secretary without just compensation. If the plaintiffs can prove this, of course, they will have made out a constitutional violation, and thus a "distinct and palpable injury." *See Secretary of State v. Joseph H. Munson Co.,* — U.S. ——, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). There are three hurdles the plaintiffs must overcome before they can prove this assertion, however. First, can the public agencies possess "private" property for purposes of the Just Compensation Clause?[17] Second, assuming that private property was taken, do the allegations establish that it was proper-

---

**16.** Exhibits attached to the complaint are parts of the complaint "for all purposes." Fed.R. Civ.P. 10(c). The Agreement is therefore before me for purposes of the standing issue, and the motion to dismiss. *Beneficial Life Insurance Co. v. Knobelauch,* 653 F.2d 393, 395 (9th Cir.1981) (citing *Amfac Mortgage Corp. v. Arizona Mall of*

*Tempe, Inc.,* 583 F.2d 426, 429–30 (9th Cir. 1978)).

**17.** This is a question of law; its resolution is not dependent upon the allegations of the complaint.

ty of the public agencies? Finally, have the public agencies properly alleged a "taking" of the property within the meaning of the Just Compensation Clause?

### (a) "Private Property"

■ The Just Compensation Clause provides that "private property" may not be taken for a public purpose without just compensation. U.S. Const. amend. 5. May a California *public* agency (a political subdivision of the State) possess "private property" within the meaning of the Just Compensation Clause?[18] Controlling authority establishes that it may. The Clause's reference to "private property" includes the property of local governments. *United States v. 50 Acres*, — U.S. —, 105 S.Ct. 451, 456, 83 L.Ed.2d 376 (1984). *Cf., Standard Oil Co. v. Arizona*, 738 F.2d 1021, 1028–29 (9th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 815, 83 L.Ed.2d 807 (1985).

■ Moreover, a taking of that property without just compensation is a "distinct and palpable" constitutional injury to the local government redressable in an action under the Just Compensation Clause; a local government or political subdivision is entitled to just compensation when the United States takes its property. *See 50 Acres*, 105 S.Ct. at 456 & n. 15 (quoting *United States v. Carmack*, 329 U.S. 230, 242, 67 S.Ct. 252, 257, 91 L.Ed. 209 (1946)); *City of St. Louis v. Western Union Telegraph Co.*, 148 U.S. 92, 101, 13 S.Ct. 485, 488, 37 L.Ed. 380 (1893). *Accord, California v. United States*, 395 F.2d 261, 263–64 (9th Cir.1968); *Washington v. United States*, 214 F.2d 33, 39 (9th Cir.), *cert.*

*denied*, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954).

### (b). *Property of the Public Agencies*

Separate and apart from the question of whether the public agencies could, as a matter of law, possess private property within the meaning of the Just Compensation Clause, the complaint must sufficiently allege that the property taken was the public agencies' property, rather than someone else's. *See United States v. City of Pittsburg*, 661 F.2d 783, 786–87 (9th Cir.1981) (quoting *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206).[19]

Here, the public agencies allege that a "contract right" of theirs—to terminate participation in Title II—was taken. The problem, as pointed out by the Secretary, is that the contractual right of termination appears to run in favor of the State, not the public agencies. The public agencies counter with the argument that they are third-party beneficiaries of the contract (as demonstrated by the Agreement itself), and thus possess the same contractual rights as the State. Thus, they argue, *they* possess the contractual right which was allegedly taken without just compensation, and therefore, they have standing to assert the claim. Resolution of this question requires an examination of the Agreement and the applicable law of third-party beneficiaries.

■ Since this case involves a contract between the State and the United States, the first question to be resolved is: what law applies?[20] The general rule is that contracts entered into by the United States pursuant to authority conferred by federal statute, are governed by federal

---

**18.** The State has expressly disclaimed any reliance upon the Just Compensation Clause of the Fifth Amendment. Moreover, the public agencies have not argued that the taking of the State's property has injured them in any way; they argue only that the taking was of their own property. Therefore, I do not consider the possibility that the statutory amendment took any property of the State without just compensation.

**19.** In *United States v. City of Pittsburg*, 661 F.2d 783 (9th Cir.1981), the Ninth Circuit held that the City did not have standing to sue for just

compensation when the only property allegedly taken belonged to the residents of the City, not the City itself. *Id.* at 786–87.

**20.** The question is whether the Agreement executed between the State and the United States creates a contractual property right of termination in the public agencies. I must determine the answer to this question because it is this asserted property right which was allegedly taken by the United States.

law.[21] *United States v. Seckinger*, 397 U.S. 203, 209–10, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970); *Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 236, 78 L.Ed.2d 227 (1983). It is not seriously disputed that the Agreement was entered into pursuant to the authority granted by 42 U.S.C. § 418, and thus the Agreement is governed by federal law. The applicable law is derived from the controlling federal statutes, and, where they are silent, from the "principles of general contract law." *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947); *Seckinger*, 397 U.S. at 210, 90 S.Ct. at 884 (citing *United States v. Standard Rice Co.*, 323 U.S. 106, 111, 65 S.Ct. 145, 147, 89 L.Ed. 104 (1944) ). Since, in this case, the governing federal statute (the Social Security Act) appears to be silent on the questions posed herein, I shall rely exclusively on what are, as best I can tell, the "principles of general contract law."[22]

▪ As a general rule, rights which arise out of contracts with the United States are "property" within the meaning of the Fifth Amendment:

> The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment.

*Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 1516 n. 16, 52 L.Ed.2d 92 (1977). The plaintiffs assert that they have rights "arising out of the contract" with the United States because they are either contracting parties, or at least third-party beneficiaries of the Agreement.

▪ It appears to be a general principle of contract law that third-party beneficiaries are possessed of rights arising out of that contract. In particular, they have the contractual right to enforce the contract. *See Williams v. Fenix & Scisson, Inc.*, 608 F.2d 1205, 1208 (9th Cir.1979). *See generally,* Restatement (Second) of Contracts §§ 304, 307 (1981); 4 Corbin, *Contracts* § 779J (1951). This right, arising from the contract, is "property" within the meaning of the Just Compensation Clause of the Fifth Amendment. To get down to basics, "property" is that group of rights which inhere in a person's relation to a physical or intangible thing. *See Ruckelshaus v. Monsanto Co.*, — U.S. ——, 104 S.Ct. 2862, 2873–74, 81 L.Ed.2d 815 (1984) (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 377–78, 65 S.Ct. 357, 259, 89 L.Ed. 311 (1945) ). It follows, therefore, that the rights arising out of a contract are "property" protected by the Fifth Amendment. The Supreme Court has so held. *See Lynch v. United States,* 292 U.S. at 579, 54 S.Ct. at 843.

▪ The final question at this stage of the standing inquiry, then, is whether the public agencies are third-party beneficiaries of the Agreement, and in particular, whether they are beneficiaries of the "escape clause." I conclude that they are. Under the general principles of contract law, a person is a third-party beneficiary if he can show that the contract was made for his direct benefit. *Williams*, 608 F.2d at 1208 (citing *German Alliance Insurance Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 35, 57 L.Ed. 195 (1912) ).

▪ In this case, the Agreement (as required by statute) specifically provides that upon the request of the State, the Title II benefits are extended by the Secretary to the public agencies. The State agrees to

---

**21.** The "federal law" referred to is often called "federal common law." *See North Side Lumber Co. v. Block,* 753 F.2d 1482, 1484 (9th Cir.1985).

**22.** I note that my *primary* inquiry at this point is not whether the United States committed a breach of contract, but only whether this case involves a contractual property right belonging to the public agencies.

pay the United States for the public agencies' participation.[23]

The specific arrangement in this case provided that the public agencies wishing to become participants in Title II were added to an appendix which was made a part of the Agreement. It thus appears that the public agencies became at least third-party beneficiaries[24] of the contract, if not actual contracting parties.

In particular, the public agencies were invested with the contractual right to terminate their participation in Title II when the State gave the Secretary two years advance termination notice.[25] I conclude that the "escape clause" is a contractual right running in favor of the public agencies, because the United States was on notice, both from the Agreement itself, and the existence of the State's enabling statutes (which were in effect at the time the public agencies were enrolled in the Program) that the State contemplated that the escape clause would run in favor of the public agencies.

The connection between the escape clause and the public agencies in this case is expressly manifested in the enabling legislation. The State, through the legislation, promised the public agencies that it would exercise the escape clause so as to release them from further participation, at their request (and with the requisite notice, etc.). Each time a public agency was enrolled in the Program, therefore, the United States was put on notice that the State would exercise the escape clause on behalf of the public agencies at their request. Under the totality of the circumstances it appears reasonable to conclude that the Agreement "is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract." *Williams*, 608 F.2d at 1208. For all of the above reasons, then, the court determines that the public agencies, as third party beneficiaries, have standing to allege a taking of their contract rights without Just Compensation.

### ii. *Causal Connection*

■ In order to establish their standing to assert the Just Compensation claim, the public agencies' complaint must establish "a causal connection between the injury and the defendant's conduct." I conclude that the plaintiffs' complaint establishes such a connection.

■ According to the complaint, the Congress' enactment of P.L. 98-21 deprived the public agencies of their right to withdraw from the Program without just compensation.[26] Subsequently, the Secretary refused to accept or honor validly tendered notifications of termination from the Program. This, I infer from the allegations, effectuated the Secretary's enforcement of the statutory enactment. In order to establish the causal connection, the plaintiffs' complaint must establish that the Congressional action (or the subsequent executive refusal to accept the notifications) actually effected a "taking" of the property by the United States.

The complaint alleges with sufficient specificity, that the contractual right to terminate participation in the program existed prior to the enactment of the statute,

---

**23.** Not surprisingly, however, the State recoups its costs by collecting it from the public agencies, pursuant to the enabling legislation.

**24.** They would be termed "donee" third party beneficiaries:

A third party ... has an enforceable right by reason of a contract made by two others ... if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.

*Williams v. Fenix & Scisson, Inc.*, 608 F.2d 1205, 1208 (9th Cir.1979) (quoting 4 Corbin, *Contracts* § 776 at 18, 19 (1951) ).

**25.** There are other requirements not at issue here.

**26.** The precise description of the type of taking employed does not appear relevant to the present inquiry, but it appears that this would constitute a "legislative taking" of property without just compensation. *See Kirby Forest Industries v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 2191, 81 L.Ed.2d 1 (1984).

and that it was taken by the statute. The existence of the right to terminate is plain from the face of the Agreement, which is attached as an exhibit to the public agencies' complaint. Moreover, it is plain from the language of the amending statute that the Congress withdrew the right to terminate (whoever actually possessed the right). The Secretary's substantive dispute with the existence of a "taking" is discussed in the motion for summary judgment.[27]

### iii. *Redress of the Injury*

 Resolution of this action in the public agencies' favor will redress the injury of which they complain. If the right to terminate is returned to them, or if they are somehow justly compensated for its loss, they will no longer have an injury. I conclude that this aspect of the standing inquiry is met by the public agencies.

### c. *The Individuals*

 The individuals claim that the defendants have denied them the equal protection of the laws. Although it may appear that in fact it is the state law, not the federal action, that has created the unequal protection problem (at least as between California public employees), this is again a question going to the merits. For purposes of the standing inquiry, the court will accept the plaintiffs' allegations as true.

Put another way, these plaintiffs allegations in the context of the statutory scheme at least arguably tender the question of whether it is federal or state law which has caused the injury of which they complain. Having sustained a purported injury, they have standing to test whether it is the federal statute which is the cause of that injury.

## B. RULE 12(b)(1) MOTION TO DISMISS

The defendants move to dismiss this claim on the grounds that pursuant to the Anti Injunction and Declaratory Judgment Acts, this court lacks jurisdiction over the subject matter. According to their argument, the plaintiffs seek an injunction and declaratory judgment against the collection of "taxes."

### 1. *Standards*

The standards applicable to a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction depend upon whether the motion is addressed to the allegations of the complaint, or to the existence of subject matter jurisdiction in fact. *See Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.1979) (citing *Land v. Dollar*, 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 1011 & n. 4, 91 L.Ed. 1209 (1947)). In this case, the defendants assert that the allegations of the complaint establish the court's lack of jurisdiction. In such a case, this court accords the plaintiffs the same procedural safeguards to which they would be entitled on a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). The standards for dismissal under Rule 12(b)(6) are well known.

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, the factual allegations of the complaint are accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam). So construed, the court may dismiss the complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spaulding*, 467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

In spite of the deference the court is bound to give to the plaintiffs' allegations, however, it is not proper for the court to assume that "the [pleader] can prove facts which it has not alleged or that the defend-

---

**27.** The Secretary argues that there was no contract from which rights could arise, and that any rights arising from the contract were not "absolute" rights protected by the Fifth Amendment.

ants have violated the ... laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983).

### 2. *Anti Injunction and Declaratory Judgment Acts*

■ The relevant portion of the Anti Injunction Act prohibits federal or state suits for the purpose of restraining the assessment or collection of any taxes. I.R.C. § 7421(a) [West Supp.1985].[28] The relevant portion of the Declaratory Judgment Act excludes suits "with respect to Federal taxes" from the class of suits which may be brought under its provisions. 28 U.S.C. § 2201.[29] Thus the threshold question in any determination of the applicability of these statutes is whether they involve a "federal tax" within the intendment of either Act.

According to the defendants, the Declaratory Judgment Act's prohibition " 'indisputably' " applies to the collection of social security taxes, citing *Bob Jones University v. Simon*, 416 U.S. 725, 741, 94 S.Ct. 2038, 2048, 40 L.Ed.2d 496 (1974). The defendants may well be correct,[30] but their assertion assumes the answer to the question. The issue is whether the payments by the State are in fact "federal taxes" (Social Security taxes or otherwise) within the meaning of the Anti Injunction or Declaratory Judgment Acts, not whether such taxes may be the subject of federal lawsuits.

It appears relatively clear that the exaction of money from the State in this case,

both prior to and subsequent to the enactment of P.L. 98–21, is not a "tax" within the meaning of the Anti Injunction or Declaratory Judgment Acts. In *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976), several states, and others, challenged "a system of monetary exactions in the form of license fees" imposed by the President of the United States pursuant to the purported statutory authority of section 232(b) of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862(b). 426 U.S. at 550–52, 96 S.Ct. at 2297–98. The Court squarely held the suits were not barred by the Anti-Injunction Act because the "monetary exactions" were not assessable under the Internal Revenue Codes:

> The Anti-Injunction Act applies to suits brought to restrain assessment of taxes assessable under the Internal Revenue Codes of 1954 and 1939.... The license fees in this case are assessed under neither Code but rather under the statutory authority conferred on the President by the Trade Expansion Act of 1962, as amended by the Trade Act of 1974. The fees are therefore not "taxes" within the scope of the Anti-Injunction Act.

426 U.S. at 558 n. 9, 96 S.Ct. at 2301–02 n. 9.

In this case, although the "monetary exactions" paid by the State into the United States Treasury are reckoned by reference to provisions of the Internal Revenue Code, they are not assessed pursuant to the Code. Rather, they are assessed pursuant to the Agreement voluntarily entered into between the State and the federal govern-

---

**28.** The relevant part of the Anti Injunction Act states:

> Except as provided [elsewhere], no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such a person is the person against whom such tax was assessed.

I.R.C. § 7421(a) [West Supp.1985]. It is established that the Anti Injunction Act deprives the district court of subject matter jurisdiction of any cases within its description. "The object of § 7421(a) is to withdraw jurisdiction from the state and federal courts to entertain suits seeking injunctions prohibiting the collections of

federal taxes." *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 5, 82 S.Ct. 1125, 1128, 8 L.Ed.2d 292 (1962) ("Williams Packing"); *Stonecipher v. Bray*, 653 F.2d 398, 401 (9th Cir. 1981), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982).

**29.** *See Williams Packing, supra*, 370 U.S. at 6–7, 82 S.Ct. at 1128–1129 (holding § 7421(a) applicable to suit to enjoin collection of social security and unemployment compensation taxes).

**30.** My conclusion here would not necessarily affect my consideration of whether the State is paying a "tax" for constitutional purposes.

ment. Even after the exactions ceased to be voluntary, they are still assessed pursuant either to the now mandatory Agreement, or pursuant to the 1983 Amendment to Title II, 42 U.S.C. § 418(g). In no event are these exactions assessed pursuant to any provision of the Internal Revenue Code. This action therefore is not barred by the Anti Injunction or Declaratory Judgment Acts.[31]

I thus conclude that the actions are not barred by the Anti Injunction or Declaratory Judgment Acts. The court finds that subject matter jurisdiction over these actions is proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

## V. THE MOTIONS FOR SUMMARY JUDGMENT

### A. *Standards*

The parties have filed cross motions for summary judgment asserting that there are no facts in dispute. Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Poller v. C.B.S.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the burden of proof on these issues. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 901 (9th Cir.1983). In this case, the material facts are undisputed, and only the legal interpretation of those facts is in dispute. The cross motions therefore turn on the applicable law.

### B. *Was There a "Taking"*

Because the court resolved in the standing context that the public agencies had a property right in the escape clause, I turn to the next requirement of a Just Compensation Claim; namely, was there a taking? Under the Agreement the public agencies had a right to withdraw; under the amended statute they do not. Nonetheless, defendants argue there was no taking. According to the defendants, 42 U.S.C. § 1304 gives the Secretary the right to alter or amend the Social Security Act no matter what effect any such alterations or amendments might have on the Agreement. That section provides: "The right to alter, amend, or repeal any provision of this chapter is hereby reserved to the Congress." 42 U.S.C. § 1304. From this language, the defendants appear to argue that there was no contract for them to breach: "Congress obviously did not intend to authorize the Administrator to enter into 'contracts' which would forever preclude Congress from amending Section 218 without the agreement of every state in the nation." (United States' Motion for Summary Judgment at 19).

To the degree that defendant's argument is predicated on the absence of a contract, it simply will not lie. Both sets of plaintiffs have attached to their complaints a writing which purports to be a contract between the State and the federal government. That document evidences an agreement between the parties signatory thereto, that each promises to do certain things and to assume certain obligations. Under any definition of contract, this is a contract. *See, e.g., Woods v. United States*, 724 F.2d 1444, 1449 (9th Cir.1984) (citing *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981) ).[32]

---

**31.** In any event, if there is no other means for the plaintiffs to challenge the validity (as opposed to the amount) of their payments to the Treasury, the lawsuit may not be subject to the restriction imposed by the Anti Injunction Act. *South Carolina v. Regan*, 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984). In the absence of briefing on this issue, the court will not rely upon that proposition. Nevertheless, the court

appreciates the highly professional behavior of the United States Attorney in bringing *South Carolina v. Regan* to its attention.

**32.** To the degree that the United States is making an argument that the contract is illusory because, by virtue of section 1304 it is not bound, the argument is just another way of expressing the notion that, section 1304 provides Congress with the power to amend both

Basing their arguments upon 42 U.S.C. § 1304, the defendants argue that the Congress may amend Title II notwithstanding whatever effect it may have upon the Agreement, because the Agreement implicitly incorporates every law existing at the time and place of execution of the contract, including 42 U.S.C. § 1304, citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n. 17, 97 S.Ct. 1505, 1516 n. 17, 52 L.Ed.2d 92 (1977) and *Home Building Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429–30, 54 S.Ct. 231, 236–37, 78 L.Ed. 413 (1934). As a result, according to the defendants, the Agreement itself contemplates that its terms may unilaterally be changed whenever the Congress chooses to do so. Under this analysis, the defendants conclude that the enactment of P.L. 98–21 was not a repudiation of the contract, but a mere exercise of Congress' right, inherent in the contract itself, to "change" the terms of the Agreement pursuant to § 1304.[33]

■ Defendants may well be correct that the Congress has the right to amend Title II whenever and however it chooses. *See* 42 U.S.C. § 1304. Nonetheless, the assertion is beside the point. Section 1304 does not authorize Congress to alter or amend the *contract*; it only authorizes the Congress to alter or amend the statute. 42 U.S.C. § 1304. Defendants' argument is predicated upon a failure to separate the terms of the Agreement from the terms of Title II prior to the challenged amendment.

*Both* the Agreement and the statute provided that the State could withdraw after the giving of two years' advance notice. I assume *arguendo* that Congress would have had the power under § 1304 (or otherwise) to divest the State of its right to withdraw if the right existed solely by virtue of the statute.[34]

In this case, however, the right to withdraw does not exist solely by virtue of the statute. The state's right to terminate draws its independent existence from the plain terms of the contract it executed with the United States. Even if Congress' power to amend the statute is incorporated into the contract, such incorporation does not address the question of whether, when Congress exercises that power, it may deprive the State of its existing contractual rights without compensation. By virtue of the Fifth Amendment, Congress is simply not free to deprive the State of its contractual right without just compensation.[35]

---

the law and the contract. Because I dispose of that argument in the text above, I do not consider it separately in the context of the sufficiency of the contract.

**33.** Although this argument is raised in another context, if it is correct it may lead to the conclusion that no "taking" occurred.

**34.** In *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), for example (cited by the defendants) the Congress had amended Title II to exclude from benefits anyone deported because of membership in the Communist Party. *Id.* at 605, 80 S.Ct. at 1370. The statute was challenged as unconstitutional. Among other arguments, the plaintiff argued that he had "an accrued property right" to the Social Security benefits, of which the statute unconstitutionally deprived him. Discussing § 1304, the Court held that the Congress had the authority to amend Title II even if it deprived a person of future benefits to which he would otherwise be entitled. *Id.* at 610–11, 80 S.Ct. at 1372. This was so because the Congress had only terminated a "noncontractual benefit" which existed solely by virtue of the statute. *Id.* at 611, 80

S.Ct. at 1373. Unlike the Congressional action in *Flemming*, the action complained of herein is the termination or abrogation of a contractual right. The *Fleming* Court expressly limited its holding by noting that the holding did not loose the Congress to "modify the statutory scheme free of all constitutional restraint." *Id.* at 611, 80 S.Ct. at 1373.

**35.** Moreover, under the defendants' own version of the law, the assumption that Congress could freely revoke the right to withdraw so long as that right did not arise out of the contract, may be unjustified. In *United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), the Court stated:

The obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement. "This Court has said that 'the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.'" ... This principle presumes that

## C. *Just Compensation*

 Congress clearly and explicitly intended to deprive the plaintiffs of their right to withdraw from the contract. *See* P.L. 98–21 § 103(a) and (b), 97 Stat. 65, 71–72, *reprinted at* [1] U.S.Code Congr. & Admin.News (98th Congr. 1st Sess., 1983). Moreover, Congress provided no means of compensation for depriving plaintiffs of that right. Ordinarily, under such circumstances plaintiff's remedy is to seek "just compensation," in the Court of Claims rather than a declaration that the action of the Government must be set aside. *Ruckelshaus*, 104 S.Ct. at 2880–83. *Cf. Robinson v. Ariyoshi*, 753 F.2d 1468, 1474–75 (9th Cir.1985). In this case I am not free simply to order "just compensation" to the plaintiffs, or to refer the case to the Court of Claims, thus possibly saving the statute from a declaration of unconstitutionality. The only rational compensation would be reimbursement by the United States to the State or public agencies, of the amount of money they currently pay to the United States for their participation in Title II, since that seems the only sensible measure of damages.

As explicated in the Secretary's Motion for Summary Judgment, the legislative history clearly demonstrates that this statute was passed in order to solve the financial crisis found to exist relative to the social security system. (Federal Motion at 1–16).[36] Its purpose was to ensure an adequate financial basis for that system by requiring the states and their public agencies to contribute to the system. (*Id.*) It simply cannot be doubted that to construe the statute so as to require the United States to pay just compensation by making the contribution for the public agencies is simply and clearly contrary to the will of Congress. While I am under an obligation to construe statutes so as to avoid a finding of unconstitutionality, I may do so only when such a construction is consistent with the will of Congress. *See, e.g., Selective Service System v. Minnesota Public Interest Group,* —— U.S. ——, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984) (quoting *CSC v. Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973) ). Here, the will of Congress cannot be given expression since to do so violates the Just Compensation provision of the Constitution. I must conclude that the Congress acted without constitutional authority when it took the plaintiffs' contractual property right to withdraw from the Agreement without just compensation and that no rational measure of damages may be awarded consistent with Congress' purpose in passing the statute. Congressional action taken without constitutional authority being void,

IT IS HEREBY DECLARED that the challenged Act of Congress, P.L. 98–21, Section 103(a) and (b), is void and of no effect as it purports to affect these plaintiffs; and the State of California and its political subdivisions have the lawful right to withdraw from Title II so long as they have met the requirements of the Agreement and the law.[37]

The Secretary of Health and Human Services is hereby ORDERED to accept the notifications of withdrawal properly tendered to her.

The remaining motions are now MOOT.

IT IS SO ORDERED.

---

contracting parties adopt the terms of their bargain *in reliance on the law in effect at the time the agreement is reached.*

*Id.* at 19 n. 17, 97 .Ct. at 1516 n. 17 (quoting *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 429–30, 54 S.Ct. 231, 237, 78 L.Ed. 413 (1934)) (emphasis added).

The law in effect at the time these parties entered into the Agreement stated that the State could withdraw from the program so long as it gave the defendants two years' advance notice. Therefore, even if the Agreement did not expressly incorporate this law, it was nonetheless implicitly incorporated.

**36.** The primary source of legislative history cited by the United States is H.R.Rep. No. 98–25, 98th Cong., 1st Sess. 11 (1983), *reprinted at* 2 U.S.Code Congr. & Admin.News 219–404 (1983).

**37.** This Opinion draws no conclusion as to the validity of the amendments as they affect anyone joining the Program subsequent to their enactment.